**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**ASHLAND**

**CIVIL ACTION NO. 12-34-JBC**

**BRITTANY RHEA GIBSON,**

**PLAINTIFF,**

**V.**               **MEMORANDUM OPINION AND ORDER**

**MICHAEL J. ASTRUE,**
**COMMISSIONER OF SOCIAL SECURITY,**               **DEFENDANT.**

**\* \* \* \* \* \* \* \* \* \* \* \***

This matter is before the court on cross-motions for summary

judgment on Brittany Rhea Gibson's appeal of the Commissioner's denial of

her application for Disability Insurance Benefits ("DIB").  The court will grant

the Commissioner's motion, R. 13, and deny Gibson's motion, R. 12,

because substantial evidence supports the administrative decision.

At the date of her disability filing, Gibson was a 21-year-old woman

with two years of college education and no past relevant work, although she

had worked part-time as a nursing aide.  She alleged a disability beginning

June 11, 2009, due to lupus.  She filed her applications on October 16,

2005, and after several administrative denials and appeals, Administrative

Law Judge ("ALJ") Caroline H. Beers issued a decision determining that

Gibson was not disabled.  AR 12-21.  Under the traditional five-step analysis

at 20 C.F.R. § 404.1520; § 416.920, the ALJ found that Gibson had not

engaged in substantial gainful activity since June 11, 2009, the alleged

onset date; that she had severe impairments consisting of idiopathic

thrombocytopenic purpura ("ITP"),[1] diabetes mellitus type 2, lupus,[2] and

obesity; that her impairments, whether considered singly or in combination,

did not meet one of the Commissioner's Listings of Impairment; that she

retained the residual functional capacity to perform a reduced range of light

level work; and that based on her RFC and the testimony of a vocational

expert ("VE"), a significant number of unskilled jobs existed in the economy

which Gibson could perform.  AR 14-20.  The ALJ thus denied Gibson's

claim of disability on January 28, 2011.  AR 21.  The Appeals Council

declined to review, AR 1-3, and this action followed.

Gibson's issues on review are: (1) that the ALJ improperly discounted

a treating physician opinion and (2) that the ALJ improperly based Gibson's

RFC on the opinions of state agency reviewers who are not medically

---

[1] Idiopathic thrombocytopenic purpura is a bleeding disorder in which the immune system destroys platelets, which are necessary for normal blood clotting. Persons with the disease have too few platelets in the blood. U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001562/ (last accessed October 5, 2012).

[2] Lupus is a long-term autoimmune disorder that may affect the skin, joints, kidneys, brain, and other organs. U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001471/ (last accessed October 5, 2012).

qualified to determine her RFC.  As a result, she argues that the RFC was not supported by substantial evidence.

The ALJ properly discounted the treating physician's opinion.  Dr. Shelly M. Rogers submitted a "Residual Functional Capacity Questionnaire" on September 29, 2010, limiting Gibson to sitting, standing, and walking zero to one hours per day, and never lifting or carrying any weight. AR 644. According to Rogers, Gibson was unable to use her hands for grasping, pushing, pulling, or fine manipulation, was unable to use her feet for repetitive use of foot controls, and was completely unable to bend, squat, crawl, climb, reach above, stoop, crouch, or kneel.  Gibson could have no exposure at all to unprotected heights, moving machinery, marked temperature changes, driving automotive equipment, exposure to dust, fumes, gases, and noise.  Her pain was said to be "severe."  AR 643-47. In support of these restrictions, Dr. Rogers cited easy bruising and bleeding due to ITP, purpura and chronic joint and muscle pain, decreased sensation of the hands due to diabetes with joint aches from rheumatological disease, and rheumatoid arthritis of the joints with decreased sensation, redness, muscle spasm, and swelling. *Id.*

The ALJ rejected Dr. Rogers's opinion because she felt it was inconsistent with her treatment notes, and because Gibson had received minimal treatment. AR 17.  The physician's office memos show that she

3

began treating Gibson on March 12, 2009, approximately three months before the alleged onset date, in order to determine whether it was safe to proceed with the extraction of her wisdom teeth in light of her diagnosis of ITP.  Dr. Rogers noted that Gibson was doing "fairly well" and continued to work without any problems.  AR 305.  Dr. Rogers approved the wisdom tooth removal, noting that, overall, Gibson had not had any problems with bleeding issues. *Id.* While she was on oral medication for diabetes, her blood sugar was fairly normal. *Id.* Gibson did not see Dr. Rogers again until October 28, 2009, when she complained of generalized aches and pains, especially in her knees and hips, and complained that she felt she could hardly walk.  AR 304.  Dr. Rogers found Gibson to be in no apparent distress with no edema or focal deficits, although Gibson did become tearful when discussing health issues.  *Id.*  Rogers was unsure whether Gibson's problems were due to lupus or possibly fibromyalgia, and prescribed an antidepressant, Cymbalta, to help with depression as well as her arthralgia.  She was also given the pain reliever Vicodin.  The following January Gibson complained that her aches and pains were worse, but again she had no focal deficits and the only objective finding was a hyperpigmented area, which Dr. Rogers thought was likely a fungal infection.  She denied any problems with bleeding. AR 303-04. She could not afford to see a rheumatologist, so her prescription for Vicodin was renewed. AR 304. At the fourth and final visit

4

to Dr. Rogers, on September 29, 2010, Gibson complained of recent leg swelling and significant pain in her joints, but once again Dr. Rogers made no specific findings. AR 722. Her only bleeding problem was heavier periods, and she had scheduled a follow-up appointment with a gynecologist. She was also being seen by a mental health clinic for her anxiety but could not afford to see a rheumatologist. *Id.*

Generally, the opinion of a treating source is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2). If the treating source opinion is not given controlling weight, the ALJ must apply certain factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of a treating source in determining what weight to give it. *Id.* The ALJ must always give "good reasons" for the weight given the treating source opinion. *Id. See Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir. 2004).

The ALJ correctly noted that Gibson was receiving no specific treatment for her lupus, that her ITP had not produced any bleeding problems other than the bleeding associated with her periods, which had been affected

5

by a recent "Depo injection," and that her diabetes appeared to be under control with oral medication.  AR 17. She had received minimal treatment. The ALJ found the treating physician's opinion to be conclusory, not supported by her own treatment notes, and not supported by the record as a whole. Other than considering the specialization of the treating source, the ALJ thus considered all of the factors set out in the regulations in providing "good reasons" for discounting the treating physician opinion. Rather than give Dr. Rogers's opinion controlling weight, the ALJ found that her underlying treatment notes were consistent with the opinion given by "state agency physicians." *Id.*

Gibson argues that it was error to dismiss the treating physician opinion as "conclusory," when the form used by Dr. Rogers was essentially the same as that used by the state agency reviewers.  The Commissioner responds that Dr. Rogers checked the most restrictive option in every single area listed on the form and it is reasonable to conclude that she was not tailoring an individual report on Gibson.  While using the term "conclusory" might not have been the best description of what Dr. Rogers was doing, any error was harmless in light of the other valid reasons given by the ALJ for discounting her opinion.  Most significantly, the dearth of objective examination or laboratory test abnormalities in Dr. Rogers's notes makes it difficult to justify the extreme restrictions assigned. The same rationale

6

applies to Gibson's contention that the ALJ should not have drawn a negative inference from her failure to seek additional medical treatment because she could not afford it. Even discounting this factor, Dr. Rogers's notes do not support the extreme restrictions she cited.

Gibson also points to the report of a one-time physical examiner, Dr. Naushad Haziq, as supporting the treating physician's opinion. Dr. Haziq examined Gibson on December 21, 2009, and concluded that she had "at least a moderate to severe limitation" in her ability to perform work-related activities. AR 293.  These vague restrictions could be interpreted as being as consistent with the ALJ's RFC as they are with Dr. Rogers's opinion. Moreover, Dr. Haziq's examination showed that Gibson was able to stand unassisted, appeared comfortable in the seated and supine positions, had no diabetic retinopathy, and had normal ranges of motion in all joints. AR 291-92. Gibson had bruises on her left arm, her right knee was painful and swollen and her right calf was tender, and she had difficulty squatting, but she was able to stand on one leg at a time without difficulty, walk on her heels and toes, could bend forward 90 degrees at the waist, and had intact sensation and reflexes. AR 292-93. These findings are not consistent with the picture of total invalidism presented by Dr. Rogers.

Gibson maintains that it was unfair for the ALJ to draw negative inferences from the treating physician's indications that her lupus and ITP

7

were "stable,"  asserting that this stability resulted from no longer working. Because Gibson had been working when she first saw Dr. Rogers and the physician did not note any worsening of her conditions at the time Gibson stopped working, it was reasonable for the ALJ to consider the apparent stability as one of many factors in the decision.

The ALJ did not impermissibly base her RFC finding on unqualified state agency sources. The first reviewer to give an opinion was a non-medical source, Joey Miracle. AR 328-34. Subsequently, a medical consultant, Dr. Alex Guerrero, considered additional evidence and offered slightly greater limitations, AR 343-49, which were adopted by the ALJ. AR 18. Gibson argues that as a psychiatric specialist Dr. Guerrero is not qualified to give an opinion on physical problems.  The website of the Kentucky Board of Medical Licensure does list Dr. "Alexis" Guerrero of Louisville as practicing in the area of psychiatry. AR 275. The Commissioner counters that public information shows that Dr. Alexis Guerrero is certified by the American Board of Psychiatry and Neurology, and that his specialty is neurology. *See* Dr. Alexis M. Guerrero, Avvo, http://www.avvo.com/doctors/alexis-guerrero-2274829.html (last visited October 4, 2012). The website of the American Board of Psychiatry and Neurology confirms that Dr. Guerrero is board-certified in "psychiatry-general," and specifies, "The purpose of the ABPN's initial certification

8

examinations is to test the qualifications of candidates in psychiatry, neurology, or both. As these medical disciplines constitute part of the broad field of general medicine, the Board requires proficiency in neurology on the part of those it certifies in psychiatry and vice versa, but examines the candidate in accordance with the certificate he or she seeks."  American Board of Psychiatry and Neurology, Inc., http://www.abpn.com/psych.html (last visited October 5, 2012). Therefore, Dr. Guerrero is proficient in neurology, whether he practices primarily as a psychiatrist or as a neurologist. 20 C.F.R. § 404.1527(f)(2)(i) provides that State agency medical consultants are "highly qualified" and "also experts in Social Security disability evaluation," and their opinions must be considered by the ALJ. In the absence of a valid opinion from a treating or examining source, Dr. Guerrero's opinion provides substantial evidence to support the ALJ's RFC finding.

The ALJ having properly applied the relevant legal standards and her decision being supported by substantial evidence,

**IT IS ORDERED** that Gibson's motion for summary judgment (R.12) is **DENIED**.

**IT IS FURTHER ORDERED** that the Commissioner's motion for summary judgment (R.13) is **GRANTED**.

The court will enter a separate judgment.

9

Signed on January 4, 2013

_Jennifer B. Coffman_
JENNIFER B. COFFMAN, JUDGE
U.S. DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY